**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE KARA M. WESTERCAMP, JUDGE**

ATC TIRES PRIVATE LTD., ATC TIRES AP PRIVATE LTD., AND YOKOHAMA OFF-HIGHWAY TIRES AMERICA, INC.

Plaintiffs,

v.

UNITED STATES,

Defendant,

and

TITAN TIRE CORPORATION

Defendant-Intervenor.

Court No. 26-02526

**NON-CONFIDENTIAL VERSION**

Confidential Information
Removed from Pages 6 to 9, 22

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Eric C. Emerson
Ron Kendler
Katherine Shin
Nicole Arellano-Brillembourg

STEPTOE LLP
1330 Connecticut Ave, NW
Washington, DC 20036
(202) 429-3000

September 29, 2026

# TABLE OF CONTENTS


I. STATEMENT PURSUANT TO USCIT R. 56.2(C) ........ 1

A. Administrative Determination Sought to Be Reviewed ........ 1

B. Questions Presented and Summary of Argument ........ 1

1. Was Commerce's denial of a CEP Offset to normal value supported by substantial evidence on the record and in accordance with law? ........ 1

2. Was Commerce's new differential pricing methodology, involving elimination of the mixed comparison method in favor of a single cutoff, and application of a two percent threshold in the price difference test, supported by substantial evidence? ........ 2

3. Was Commerce's decision to reject ministerial errors as untimely made in accordance with law? ........ 2

II. STATEMENT OF FACTS ........ 2

A. Overview ........ 2

B. CEP Offset ........ 4

1. Commerce's dumping methodology and application of the CEP Offset ........ 4

2. ATC's evidence regarding the home-market and CEP LOTs in the POR7 administrative review ........ 5

3. Commerce's *Preliminary Results* and ATC's case brief ........ 9

4. Commerce's *Final Results* ........ 10

C. Differential Pricing ........ 11

1. Commerce's use of differential pricing in antidumping proceedings and the POR7 Review ........ 11

2. Commerce's *Preliminary Results* and ATC's case brief ........ 14

3. Commerce's *Final Results* ........ 15

D. ATC's Ministerial Error Submission ........ 16

III. STANDARD OF REVIEW ........ 17

IV. ARGUMENT ........ 19

A. Commerce's Denial of a CEP Offset on U.S. Price was Unsupported by Substantial Evidence and Contrary to Law ........ 19

1. Statutory and regulatory basis for CEP Offset ........ 19

2. ATC's Home Market sales occurred at a more advanced LOT than its CEP sales and the evidence submitted by ATC satisfied the statutory requirements for a CEP offset 21

3. Commerce failed to address precedent supporting a CEP offset on comparable facts. 24

4. Commerce failed to explain its departure from prior, consistent treatment of ATC .... 25

5. Under this Court's precedent, Commerce's failure to explain its apparent change in CEP Offset practice was arbitrary and capricious ...................................................... 26

B. Commerce's Differential Pricing Analysis for Determining Targeted Dumping Was Unreasonable........................................................................................................ 29

1. Commerce's application of a two percent threshold produces unreasonable results because it fails to account for sample sizes and improperly uses passed data to pass additional data ........................................................................................... 30

a. Explanation of the steps in Commerce's differential pricing methodology ............. 30

b. Commerce's new differential pricing analysis results in technical absurdities ........ 35

i. The methodology does not properly consider sample sizes................................. 35

ii. Using passed data to pass additional data generates incoherent results................ 38

c. The two percent threshold is overly rigid and unreasonable when applied ............. 39

d. Commerce's reliance on other methodologies using a two percent threshold to demonstrate reasonableness for the differential pricing analysis is unreasonable............ 40

2. Commerce failed to provide a reasonable explanation for the elimination of the mixed method comparison methodology ................................................................... 41

C. Commerce's Decision to Reject Ministerial Errors as Untimely Was Contrary to Law .. 43

1. Section 751(h) requires Commerce to provide an opportunity to present the error in the final results ........................................................................................... 43

2. Commerce cannot nullify a statutory right through application of its regulation......... 45

V. CONCLUSION AND RELIEF SOUGHT ............................................................ 46

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Agro Dutch Indus. Ltd. v. United States*,
508 F.3d 1024 (Fed. Cir. 2007)....................43

*Alloy Piping Prods., Inc. v. United States*,
33 CIT 349 (2009) ....................20, 21

*Altx, Inc. v. United States*,
370 F.3d 1108 (Fed. Cir. 2004)....................17

*Andaman Seafood Co. v. United States*,
35 CIT 451, 768 F. Supp. 2d 1315 (2011)....................24

*Apex Frozen Foods Ltd. v. United States.*,
144 F. Supp. 3d 1308 (Ct. Int'l Trade 2016) ....................43

*Atlantic Sugar, Ltd. v. United States*,
744 F.2d 1556 (Fed. Cir. 1984)....................18

*British Steel PLC v. United States*,
127 F.3d 1471 (Fed. Cir. 1997)....................27, 28

*Catfish Farmers of America v. United States*,
815 F. Supp. 3d 1339 (Ct. Int'l Trade 2025) ....................44, 46, 47

*Changzhou Hawd Flooring Co. v. United States*,
848 F.3d 1006 (Fed. Cir. 2017)....................26

*Consolidated Bearings Co. v. United States*,
348 F.3d 997 (Fed. Cir. 2003)....................27, 28

*CS Wind Vietnam Co. v. United States*,
832 F.3d 1367 (Fed. Cir. 2016)....................41

*Delverde, SrL v. United States*,
202 F.3d 1360 (Fed. Cir. 2000)....................23

*Diamond Sawblades Manufacturers' Coal. v. United State*s,
219 F. Supp. 3d 1368 (Ct. Int'l Trade 2017)....................40

*Hangzhou Spring Washer Co. v. United States*,
29 CIT 657, 387 F. Supp. 2d 1236 (2005)....................27, 29

*Husteel Co. v. United States*,
463 F. Supp. 3d 1334 (Ct. Int'l Trade 2020) ....................25

*Husteel Co. v. United States*,
494 F. Supp. 3d 1287 (Ct. Int'l Trade 2021) ....................25

*Hyundai Steel Co. v. United States*,
279 F. Supp. 3d 1349 (Ct. Int'l Trade 2017) ....................17

*Jiangsu Senmao Bamboo & Wood Indus. Co., v. United States*,
698 F.Supp.3d 1277 (Ct. Int'l Trade 2024) ....................18, 27, 28

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)....................18, 22, 45, 47

*Marmen Inc. v. United States*,
134 F.4th 1334 (Fed. Cir. 2025) .................... *passim*

*Micron Tech., Inc. v. United States*,
243 F.3d 1301 (Fed. Cir. 2001)....................22

*Mid Continent Nail Corp. v. United States*,
34 CIT 512, 712 F. Supp. 2d 1370 (2010) ....................15, 16, 39

*Mid Continent Steel & Wire, Inc. v. United States*,
940 F.3d 662 (Fed. Cir. 2019)....................19, 30, 42

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)....................19, 29, 40, 41

*Nippon Steel Corp. v. United States*,
337 F.3d 1373 (Fed. Cir. 2003)....................17

*Officine Tecnosider SRL v. United States*,
798 F. Supp. 3d 1363 (Ct. Int'l Trade 2025) ....................31

*Rhone Poulenc, Inc. v. United States*,
927 F. Supp. 451 (Ct. Int'l Trade 1996) ....................18

*Save Domestic Oil, Inc. v. United States*,
26 CIT 1380, 240 F. Supp. 2d 1342 (2002)....................27, 29

*Seah Steel Corp. v. United States*,
513 F. Supp. 3d 1367 (Ct. Int'l Trade 2021)....................19

*Shandong Dongfang Bayley Wood Co. v. United States*,
375 F. Supp. 3d 1339 (Ct. Int'l Trade 2019) ....................29

*SKF USA Inc. v. United States*,
263 F.3d 1369 (Fed. Cir. 2001)....................18, 26

*Stupp Corp. v. United States*,
365 F. Supp. 3d 1373 (Ct. Int'l Trade 2019) ....................19

*Stupp Corp. v. United States*,
5 F.4th 1341 (Fed. Cir. 2021) .................... *passim*

*Universal Camera Corp. v. NLRB*,
340 U.S. 474 (1951)....................18

*Universal Tube & Plastic Indus., Ltd. v. United States*,
586 F. Supp. 3d 1312 (Ct. Int'l Trade 2022) ....................22, 23

*Ventura Coastal, LLC v. United States*,
736 F. Supp. 3d 1342 (Ct. Int'l Trade 2024) ....................22

*Xi'an Metals & Minerals Imp. & Exp. Co. v. United States*,
520 F. Supp. 3d 1314 (Ct. Int'l Trade 2021) ....................31

**Statutes**

19 U.S.C. § 1516a....................17

19 U.S.C. § 1675(h) .................... *passim*

19 U.S.C. § 1677a....................4

19 U.S.C. § 1677b....................4

19 U.S.C. § 1677b(a)(7)....................4, 22

19 U.S.C. § 1677b(a)(7)(A) ....................4, 9, 22

19 U.S.C. § 1677b(a)(7)(A)(i) ....................4, 24

19 U.S.C. § 1677b(a)(7)(A)(ii) ....................4, 20, 22, 24

19 U.S.C. § 1677b(a)(7)(B) ....................5, 20, 22

19 U.S.C. § 1677f-1(d)(1)....................11

19 U.S.C. § 1677f-1(d)(1)(B) ....................11, 30, 31

**Treatises**

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103–316, vol. 1 at 842–83 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4178....................12

**Regulations**

19 C.F.R. § 351.224(c)....................2

19 C.F.R. § 351.224(c)(1)....................44, 45, 46

19 C.F.R. § 351.309(c)(2)....................46

19 C.F.R. § 351.412....................4

19 C.F.R. § 351.412(a)....................4

19 C.F.R. § 351.412(f)....................5

19 C.F.R. § 351.414(b)....................11

19 C.F.R. § 351.414(b)(2)-(3)....................12

19 C.F.R. § 351.414(c)(1)....................11

19 C.F.R. § 351.414(c)(1), (2)....................12

19 C.F.R. § 351.414(c)(2)....................12

**Federal Register Notices**

*Certain New Pneumatic Off-the-Road Tires From India: Affirmative Amended Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 82 Fed. Reg. 9,056 (Feb. 2, 2017)....................5

*Certain New Pneumatic Off-the-Road Tires From India: Notice of Rescission of Antidumping Duty Administrative Review; 2017-2018*, 83 Fed. Reg. 35,619 (July 27, 2018)....................5

*Certain New Pneumatic Off-the-Road Tires From India: Preliminary Results of Antidumping Duty Administrative Review; 2021-2022*, 88 Fed. Reg. 20,471 (Apr. 6, 2023)....................5

# I. STATEMENT PURSUANT TO USCIT R. 56.2(C)

## A. Administrative Determination Sought to Be Reviewed

Plaintiffs ATC Tires Private Ltd. ("ATC Tires"), Yokohama Off-Highway Tires America, Inc. ("YOHTA"), and ATC Tires AP Private Ltd. ("ATC AP") (collectively, "ATC") contest the final results of the U.S. Department of Commerce ("Commerce") in the seventh administrative review of the antidumping duty ("AD") order covering certain new pneumatic off-the-road ("OTR") tires from India (Case No. A-533-869) ("*Final Results*"), covering entries during the period of review ("POR") of March 1, 2023 to February 29, 2024 ("POR7"). *See Certain New Pneumatic Off-the-Road Tires From India: Final Results of Antidumping Duty Administrative Review; 2023-2024*, 91 Fed. Reg. 9,553 (Feb. 26, 2026) (P.R. 13) and accompanying Issues and Decision Memorandum ("Final IDM") (P.R. 14).

## B. Questions Presented and Summary of Argument

### 1. Was Commerce's denial of a CEP Offset to normal value supported by substantial evidence on the record and in accordance with law?

No. Commerce's denial of a constructed export price offset ("CEP Offset") was unsupported by substantial evidence and contrary to law. ATC provided extensive record evidence demonstrating that its home-market sales were at a more advanced level of trade ("LOT") than its CEP sales, including the nature and intensity of selling functions performed by ATC in each market. Commerce refused to find that such differences justified a CEP Offset, in part by requiring ATC to demonstrate how the LOT differences affected price comparability, which is the statute requires for a level of trade adjustment ("LOT Adjustment"), which is separate and distinct from a CEP Offset. Commerce also failed to meaningfully address precedent supporting a CEP offset on comparable facts, and unreasonably departed from its consistent prior practice of granting ATC a CEP offset based on materially similar evidence.

**2. Was Commerce's new differential pricing methodology, involving elimination of the mixed comparison method in favor of a single cutoff, and application of a two percent threshold in the price difference test, supported by substantial evidence?**

No. Commerce's new differential pricing methodology, which eliminates the mixed comparison method and involves the application of a price difference test featuring a two percent threshold, is unreasonable. Commerce claims that the elimination of the mixed method enhances its ability to address "masked dumping" and is more closely aligned with the statute, but failed to provide any explanation as to how it does so. Moreover, the two percent threshold used is overly rigid, and produces unreasonable results when applied. Commerce also justified its use of a two percent threshold test by citing its use in other antidumping methodologies, which are materially different and not reasonable in the differential pricing context.

**3. Was Commerce's decision to reject ministerial errors as untimely made in accordance with law?**

No. Commerce's rejection of ATC's timely ministerial error allegation regarding Commerce's double counting of a U.S. movement expense was contrary to law. Section 751(h) of the statute, 19 U.S.C. § 1675(h), specifically requires Commerce to ensure that parties may present their arguments regarding any ministerial error made by Commerce in the final results. ATC timely submitted its ministerial error comments as required by 19 C.F.R. § 351.224(c). However, Commerce rejected ATC's submission because ATC did not raise the issue in its case brief. Commerce's rejection was contrary to the statute, which provides that Commerce cannot foreclose a party's opportunity to identify ministerial errors after the final results.

## II. STATEMENT OF FACTS

### A. Overview

Commerce initiated the POR7 review on May 2, 2024. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 89 Fed. Reg. 38,867 (May 8, 2024) (P.R. 192),

later selecting ATC for individual examination as a mandatory respondent. Memorandum to Elizabeth Eastwood, through Robert Copyak, from Eric Chen, Re: Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from India: Respondent Selection (May 29, 2024) (P.R. 180).

In its preliminary results, Commerce calculated a margin of 3.78 percent for ATC. *Certain New Pneumatic Off-the-Road Tires From India: Preliminary Results and Partial Recission of Antidumping Duty Administrative Review; 2023-2024*, 90 Fed. Reg. 30,871 (July 11, 2025) ("*Preliminary Results*") (P.R. 42), accompanying Issues and Decision Memorandum, ("Preliminary IDM") (P.R. 43) and accompanying Preliminary Calculation Memorandum ("Preliminary Calculation Memorandum") (C.R. 17).

Following parties' case and rebuttal briefs, Commerce issued the *Final Results*, making no change to ATC's dumping margin. *See Final IDM* (P.R. 14). Following their review of the *Final Results,* Plaintiffs filed comments on a ministerial error contained therein. Letter from Eric C. Emerson to Hon. Howard Lutnick, Re: ATC Tires Private Ltd., ATC Tires AP Private Ltd., and Yokohama Off-Highway Tires America, Inc.'s Ministerial Error Comments (Feb. 27, 2026) ("Ministerial Error Comments") (C.R. 3). Commerce rejected the submission as untimely and removed the comments from the record. *See* Letter from Alice Maldonado to Eric C. Emerson, Re: 2023-2024 Antidumping Duty Administrative Review of Certain New Pneumatic Off-the-Road Tires from India: Rejection of Untimely Ministerial Error Allegation (Mar. 11, 2026) ("Ministerial Error Letter") (P.R. 8). Plaintiffs filed a summons with this Court on March 27, 2026 and a complaint on April 27, 2026. *See* ECF 1, ECF 8. Plaintiffs below address the facts of each issue on which this appeal is based.

## B. CEP Offset

### 1. Commerce's dumping methodology and application of the CEP Offset

Commerce uses normal value ("NV"), which is generally the home-market price of the foreign like product, to determine whether subject merchandise was sold in the United States at less than fair value. *See* 19 U.S.C. § 1677b. Specifically, Commerce compares NV to either export price ("EP") or constructed export price ("CEP"), the latter of which is the price of a U.S. sale made through an affiliated seller, adjusted by deducting certain U.S. selling expenses and profit. *See* 19 U.S.C. § 1677a.

The level of trade ("LOT") describes a sale's position in the distribution chain, based on the selling functions performed by a respondent (i.e., the foreign producer/exporter of the subject merchandise and/or its affiliated importer) and the intensity of those selling functions in either the home or U.S. markets. *See* 19 U.S.C. § 1677b(a)(7)(A); 19 C.F.R. § 351.412. Because sales at different LOTs may not be comparable, Commerce has the authority to adjust NV to account for differences between the home-market and U.S. LOTs. *See id.*

Section 773(a)(7) of the Tariff Act of 1930 provides for two adjustments to NV. 19 U.S.C. § 1677b(a)(7). Commerce can make an LOT adjustment to NV ("LOT Adjustment") to account for any differences in LOT between NV on the one hand and EP or CEP on the other, where there exist multiple LOTs in a given market that involve the performance of different selling activities that affect price comparability. *See* 19 U.S.C. § 1677b(a)(7)(A)(i), (ii); 19 C.F.R. § 351.412(a) (explaining that, in the context of an LOT adjustment, "sales in the two markets were not made at the same level of trade").

Conversely, where the available data do not provide an appropriate basis for an LOT Adjustment, but NV is still established at an LOT that "constitutes a more advanced stage of distribution" than the CEP LOT (thus requiring that U.S. sales are made at the CEP LOT), then

Commerce will make a CEP offset ("CEP Offset") to NV, thereby reducing normal value. 19 U.S.C. § 1677b(a)(7)(B); 19 C.F.R. § 351.412(f).

Commerce regularly groups selling functions into five categories: sales support, training services, technical support, logistical services, and sales-related administrative activities. *See, e.g.*, *Final IDM* at 18-19 (P.R. 14). In its questionnaire, Commerce requests both qualitative and quantitative evidence of differences in selling functions to support the granting of either an LOT Adjustment or a CEP Offset. *See* Letter from Eric C. Emerson to Hon. Gina M. Raimondo, Re: Certain New Pneumatic Off-the-Road Tires from India: ATC Tires Private Ltd., ATC Tires AP Private Ltd., and Yokohama Off-Highway Tires America, Inc.'s Section A Questionnaire Response (June 28, 2024) ("AQR") at 18-19, 39 (C.R. 270-79; C.R. 286-89).

#### 2. ATC's evidence regarding the home-market and CEP LOTs in the POR7 administrative review

In the original investigation and subsequent administrative reviews,[1] ATC submitted information to Commerce supporting the application of a CEP Offset, which Commerce granted. *See Certain New Pneumatic Off-the-Road Tires From India: Affirmative Amended Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 82 Fed. Reg. 9,056 (Feb. 2, 2017) and accompanying Issues and Decision Memorandum; *Certain New Pneumatic Off-the-Road Tires From India: Final Results of*

[1] Following the implementation of the AD Order in 2017, ATC requested, and Commerce initiated, an administrative review for the first period of review, covering February 2, 2017 through February 28, 2018. Later, ATC timely withdrew its request and Commerce rescinded the review. *See Certain New Pneumatic Off-the-Road Tires From India: Notice of Rescission of Antidumping Duty Administrative Review; 2017-2018*, 83 Fed. Reg. 35,619 (July 27, 2018). Commerce did not receive any requests for administrative reviews until the fifth administrative review, covering March 1, 2021 through February 28, 2022, when Petitioner Titan Tire Corporation requested such review. *See Certain New Pneumatic Off-the-Road Tires From India: Preliminary Results of Antidumping Duty Administrative Review; 2021-2022*, 88 Fed. Reg. 20,471 (Apr. 6, 2023) and accompanying Issues and Decision Memorandum at 1.

*Antidumping Duty Administrative Review; 2021-2022* (Oct. 12, 2013) and accompanying Issues and Decision Memorandum; *Certain New Pneumatic Off-the-Road Tires From India: Final Results of Antidumping Duty Administrative Review; 2022-2023*, and accompanying Issues and Decision Memorandum.

Thus, in the POR7 review, ATC submitted similar, detailed information in its Section A response, consistent with that submitted in the original investigation and administrative reviews, demonstrating that its home-market sales process involved more extensive sales-support activities than its sales process for CEP sales. *See* AQR at 20-39 (C.R. 279), Exhs. 9, 10a-10z (C.R. 279).

**<u>Sales Support</u>**

ATC submitted evidence showing how, in India, it carried out regular sales forecasts, market research, extensive sales promotion, and employed personnel dedicated to home-market customers. *See id.* at 20-23, Exhs. A-10a–A-10h. For example, ATC's aftermarket sales personnel made more than [ ] customer visits per month, while its original-equipment sales personnel visited active customers at least quarterly. *Id.* at 22. ATC did not perform such activities for CEP sales because its affiliated U.S. reseller YOHTA performed those functions independently. *See id.* at 32–34.

Responding to Commerce's supplemental Section A questionnaire, ATC submitted additional evidence and explanations reinforcing and supporting these distinctions. For example, YOHTA independently conducted all U.S. market forecasting through its own personnel, systems and customer data without input from ATC. Letter from Eric C. Emerson to Hon. Howard Lutnick, Re: Certain New Pneumatic Off-the-Road Tires from India: ATC Tires Private Ltd., ATC Tires AP Private Ltd., and Yokohama Off-Highway Tires America, Inc.'s

Supplemental Sections A and B Questionnaire Response (Feb. 24, 2025) ("SABQR") at 9-10 (C.R. 118), Exhs SA-9a–SA-11 (C.R. 113 - 117). Likewise, YOHTA alone conducted U.S. market research and developed U.S.-specific product brochures and promotional materials. *See id.* at 11 (C.R. 118), Exhs. SA-10–SA-11 (C.R. 113, 114).

**Training Services**

ATC regularly trained distributors and end users regarding tire use, safety, and maintenance in India, but not in the United States. *See* AQR at 23-24 (C.R. 279), Exhs. A-10i–A10j (C.R. 279). ATC's service and sales teams also conducted multiple training sessions in India during POR7. *See* AQR at 23-24 (C.R. 270). By contrast, ATC did not train YOHTA's sales personnel or U.S. customers, who were trained by YOHTA staff. SABQR at 12 (C.R. 118), Exh. SA-12 (C.R. 113).

**Logistical Services**

Differences in logistical services were equally substantial. ATC maintained and managed home-market sales inventory at [ ] Indian distribution warehouses in addition to its factory warehouses. AQR at 26-27 (C.R. 279), Exhs. A-10p, A-10q, A-10r (C.R. 279). ATC also arranged frequent, comparatively small deliveries from multiple production and warehouse locations to customers throughout India. *Id.* at 27-29 (C.R. 279), Exhs. A-10s, A-10z (C.R. 279). In contrast, ATC did not maintain warehouse inventory for CEP sales. *Id.* at 36; *see also* SABQR at 13 (C.R. 118). Rather, ATC shipped finished merchandise from its plants to a few Indian ports, generally in full container loads, at which point YOHTA assumed responsibility for ocean freight and U.S. distribution. AQR at 28 (C.R. 279), Exh. A-10z (C.R. 279).

Moreover, per-unit administrative and logistical efforts associated with home-market delivery were far greater than for CEP sales, given that an average home-market delivery

involved approximately [ ] tires, whereas a typical U.S. container contained approximately [ ] tires. *Id.* at 28 (C.R. 279).

**<u>Sales Related Administrative Activities</u>**

ATC's order-processing and sales-administration functions were also more complex at the home-market LOT than the CEP LOT. ATC sold to multiple original-equipment customers and hundreds of aftermarket distributors and end users in India. *Id.* at 29 (C.R. 279). Its personnel manually reviewed and processed orders, confirmed prices and taxes, coordinated production and inventory, managed delivery, and issued invoices. *See id.* at 29-31 (C.R. 279), Exh. A-11 (C.R. 278 – 279). ATC also administered home-market rebate programs, cash discounts, deposits, and warranty claims. *See id.* at 31-32 (C.R. 279), Exhs. A-10u, A-10v, A-10w (C.R. 279).

By contrast, for CEP sales, ATC received orders from a single affiliated customer, YOHTA, through an integrated electronic, largely automated process. *See id.* at 37-38 (C.R. 279), Exh. A-12 (C.R. 278); *see also* SABQR at 13 (C.R. 118). ATC did not provide rebates or cash discounts to YOHTA, and YOHTA bore the expense of U.S. warranty claims, independently determining whether to provide commercial adjustments to its customers. AQR at 38 (C.R. 279); *see* SABQR at 14-15 (C.R. 118), Exhs. SA-14, SA-15a, SA-15b (C.R. 112).

**<u>Minimal Overlap Between HM and CEP LOTs</u>**

Although there was some overlap in selling functions across the home-market and CEP LOTs, ATC generally performed those common functions more intensively in the home market. *See* AQR at Exh. A-9 (C.R. 279). Advertising and marketing, for example, required ATC to develop India-specific materials, regional-language communications, local advertisements, and promotional items for home-market customers. *See id.* at 21-22 (C.R. 279), Exhs. A-10c–A-10g

(C.R. 279); *see also* SABQR at 7 (C.R. 118), Exhs. SA-6a, SA-6b (C.R. 117). For CEP sales, ATC's role was principally limited to maintaining group-level brand guidelines and providing technical information, while YOHTA created U.S.-specific brochures and marketing materials. *See* AQR at 33-34 (C.R. 279); *see* SABQR at 10 (C.R. 118), Exh. SA-10 (C.R. 114).

**<u>Quantitative Analysis</u>**

In response to Commerce's request for a quantitative analysis showing how expenses in each LOT affected price comparability, ATC explained that the statute specifically provides that price comparability is not required for a CEP Offset, given its explicit requirement for such as a prerequisite only to attain an LOT Adjustment). *See* AQR at 41 (citing 19 U.S.C § 1677b(a)(7)(A)) (C.R. 279). Nevertheless, ATC provided a quantitative comparison of home-market and U.S. indirect selling expenses, demonstrating that such expenses incurred in the home market were [ ] greater than that those incurred for the U.S. market, *id.* at 42 (C.R. 279), leading to a home-market indirect selling expense ratio [ ] higher than the U.S. market ratio. *See id.*

**3. Commerce's *Preliminary Results* and ATC's case brief**

In the *Preliminary Results*, Commerce first analyzed ATC's reported channels of distribution and selling activities, and found that ATC had one home-market LOT and one CEP LOT. *Preliminary IDM* at 14 (P.R. 43). Commerce then compared ATC's home market and U.S. LOTs and found that the record did not contain sufficient quantitative evidence to determine whether the NV LOT was made at a more advanced stage of distribution than the CEP LOT. *Id.* Specifically, Commerce found that ATC's quantitative analysis did not demonstrate differences in price comparability – even though the statute does not require such demonstration for the granting of a CEP Offset. *See id.* Consequently, Commerce denied ATC a CEP Offset. *Id.*

In its case brief, ATC argued that Commerce should grant a CEP Offset because its home-market sales, as demonstrated by the record, were made at a more advanced LOT than its CEP sales. *See* Letter from Eric C. Emerson to Hon. Howard Lutnick, Re: Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off the-Road Tires from India: Case Brief of ATC Tires Private Ltd., ATC Tires AP Private Ltd., and Yokohama Off-Highway Tires America, Inc. (Aug. 6, 2025) ("ATC Case Brief") at 3-11 (C.R. 9). That is, ATC performed more selling functions, and generally performed any shared functions more intensively, in the home market.

ATC further argued that Commerce improperly disregarded this evidence and required proof of price comparability, which is not necessary for a CEP Offset. *See id.* at 14-17. Finally, ATC explained that, in any event, its data quantitatively supported the claimed differences, and that granting a CEP Offset would be consistent with Commerce's doing so in the previous segments of the proceeding. *See id.* at 17-20.

**4. Commerce's *Final Results***

In the *Final Results*, Commerce again denied ATC a CEP Offset. *Final IDM* at 17 (P.R. 14). Although Commerce acknowledged that ATC performed additional home-market functions and claimed greater intensity for functions common to both markets, it discounted certain activities as "basic" and questioned particular supporting documents. *Id.* at 19, 21. Commerce's analysis did not account for the cumulative significance of ATC's additional sales activities in the home market, which Commerce itself cited. *See id.* at 20 ("The decision to grant a CEP offset . . . represents a holistic examination of the extent of the selling activities performed and their significant to the company's selling operations.").

Rather, Commerce took issue with specific functions and documentation, such as ATC's warranty services, and otherwise reiterated its preliminary finding regarding what it considered a

lack of sufficient quantitative support for a CEP Offset. *Id.* at 20-21. Commerce then concluded that the differences between ATC's home market and U.S. selling activities were neither "substantial" nor established that the sales were made at different marketing stages. *Id.* at 21. Commerce also determined that ATC's quantitative analysis "did not demonstrate a quantitative link between the performance of selling functions and the reported intensity levels." *Id.* at 20. Commerce failed to address ATC's discussion of the impact of the quantitative data with respect to various selling activities such as sales forecasting, sales personnel, cash discounts, rebate services, and freight and delivery. *See id.* at 21; *see also* ATC Case Brief at 18-20 (C.R. 9).

### C. Differential Pricing

#### 1. Commerce's use of differential pricing in antidumping proceedings and the POR7 Review

To calculate a dumping margin, 19 U.S.C. § 1677f-1(d)(1) requires Commerce to compare the weighted average NV with the weighted average EP or CEP for comparable merchandise (i.e., the average-to-average, or A-A method), unless "there is a pattern" of EPs or CEPs "for comparable merchandise that differ significantly among purchasers, regions, or periods of time," and Commerce "explains why such differences cannot be taken into account" using the A-A method. *See* 19 U.S.C. § 1677f-1(d)(1)(B); 19 C.F.R. § 351.414(b). Such a pattern is presumed to indicate "targeted" or "masked" dumping.

If Commerce determines that targeted dumping exists, it may use alternative methods to calculate the dumping margin. *See* 19 C.F.R. § 351.414(c)(1). These methodologies include the transaction-to-transaction, or T-T method, which compares NVs of individual transactions with EPs or CEPs of individual transactions; or the average-to-transaction, or A-T method, which compares the weighted average of NVs to EPs or CEPs of individual sales. 19 C.F.R.

§ 351.414(b)(2)-(3). The regulation limits use of the T-T method to "unusual situations"[2] and instructs Commerce to use the A-A method unless an alternative, such as the A-T method, is appropriate. 19 C.F.R. § 351.414(c)(1), (2).

Commerce determines whether application of the A-T method is appropriate through its differential pricing analysis. This analysis is informed by the Statement of Administrative Action ("SAA"), which requires Commerce to "proceed on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103–316, vol. 1 at 842–83 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4178 ("SAA"). Prior to the decision of the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") in *Marmen Inc. v. United States* ("*Marmen*"), 134 F.4th 1334 (Fed. Cir. 2025), Commerce's differential pricing analysis involved three steps: (1) The Cohen's *d* test; (2) the ratio test; and (3) the meaningful difference test.

First, the Cohen's *d* test measured whether the prices to a particular purchaser, region, or time period differed significantly from the prices for all other purchasers, regions, or time periods. Commerce applied the Cohen's *d* test for each test group (i.e., purchasers, regions, and time periods). If the resulting Cohen's *d* value was equal to or greater than 0.8 for any test group, Commerce deemed the sales prices in that particular test group to have "passed." *See Marmen*, 134 F.4th at 1344.

Second, Commerce examined whether a pattern of significant price differences existed by calculating the total percentage of passing transactions out of the total sales (i.e., the ratio test).

---

[2] These "unusual situations" can include those where there are a small number of sales of subject merchandise, the merchandise sold in each market is very similar, identical, or custom-made. 19 C.F.R. § 351.414(c)(2).

*See Stupp Corp. v. United States*, 5 F.4th 1341, 1347 (Fed. Cir. 2021). If 33 percent or less of the transactions passed, Commerce applied the A-A method. *Id.* If 66 percent or more of the transactions passed, Commerce applied the A-T method. *Id.* If the between 33 to 66 percent of the transactions passed, Commerce applied the A-T method for passing transactions and A-A method for the non-passing transactions (the "mixed method"). *See id.*

Finally, Commerce confirmed whether the selected method was appropriate by examining whether there was a "meaningful difference" between the A-A method or an alternative method. *See id.* Under this test, if (1) the dumping margin calculated using the A-A method fell below the *de minimis* threshold of two percent, but the margin calculated using the A-T method exceeded the *de minimis* two percent threshold; and (2) the A-T margin exceeded 25 percent of the dumping margin calculated using the A-A method, then Commerce determined that a meaningful difference existed and applied the A-T method. *See id.*

In *Marmen*, the Federal Circuit found that Commerce's reliance on Cohen's *d* was unreasonable where the underlying data are not normally distributed, equally variable, and equally and sufficiently numerous. 134 F.4th at 1348. The Federal Circuit overturned Commerce's use of Cohen's *d*, but concluded that Commerce may use "some of the ideas underlying Cohen's analysis of group differences as long as the resulting analysis is itself justified as sound for gauging differences in the data sets at issue." *Id*. Commerce subsequently adopted a new differential pricing methodology for all antidumping proceedings, also involving three steps.

First, Commerce replaced the Cohen's *d* test with a "price difference" test, under which it determines whether prices differ significantly by comparing the weighted-average net price to a given purchaser, region, or time with the weighted-average net price to all others in the same

groupings. *Preliminary IDM* at 7 (P.R. 43). If the weighted-average net price of the comparison group falls outside of a two percent threshold, then the sales are deemed to "pass" the price difference test, i.e., Commerce considers the prices to differ significantly. *Id.*

Second, Commerce applies the ratio test to measure the extent of the price difference, i.e., whether a pattern of significant price differences existed during the POR, and in turn, whether it should apply the A-A method or the A-T method. *Id.* Specifically, if 33 percent or less of the total value of sales pass the price difference test (i.e., no pattern of significant price differences), Commerce uses the A-A method. *Id.* If more than 33 percent of sales pass the price difference test, Commerce will find that a pattern of significant price differences and will then go on to the third step (i.e., the meaningful difference test). *Id.* Notably, Commerce has eliminated the mixed method from its analysis. *See id.* at 7 n.19.

Third, Commerce applies the meaningful difference test, as applied pre-*Marmen.* If the dumping margin calculated using the A-A and A-T methods pass the meaningful difference test, then Commerce uses the A-T method to calculate the dumping margin. *Id.* at 7.

**2. Commerce's *Preliminary Results* and ATC's case brief**

In the *Preliminary Results*, Commerce applied its new methodology and determined that (1) 97.06 percent of ATC's total value of sales passed the price difference test; and (2) the dumping margin crossed the *de minimis* threshold depending on the method used. *Id.* at 8. Accordingly, Commerce used the A-T method to calculate ATC's dumping margin. *See Preliminary Calculation Memorandum* at 4 (C.R. 17); *see also Preliminary IDM* at 8 (P.R. 43).

Following the *Preliminary Results*, ATC argued in its case brief that Commerce's new price difference test and elimination of the mixed method were unreasonable. *See* ATC Case Brief at 21-29 (C.R. 9). Specifically, ATC argued that Commerce failed to explain why a two percent threshold was sufficient to identify a pattern of significant price differences. *Id.* at 25.

ATC noted that, in *Mid Continent Nail Corp. v. United States*, 34 CIT 512, 520 n.10, 712 F. Supp. 2d 1370, 1378 n.10 (2010), this Court raised concerns over a similar test (the P/2 test) that used a strict two percent band to compare the weighted average net price of targeted and non-targeted dumped sales. *See* ATC Case Brief at 25-26 (C.R. 9). As ATC explained, that concern was relevant because, as the Court explained, a strict two percent requirement could capture too many or few sales, depending on price variations. *See id.* at 28.

ATC further argued that eliminating the mixed method directly contradicted the Federal Circuit's language in *Stupp*, where the court found that the 33 percent to 66 percent range was reasonable because a single cutoff might result in dumping margins that are too high or too low. *See id.* ATC requested that Commerce explain why its new single cutoff at 33 percent results in a more accurate calculation of the dumping margin over the mixed method. *See id.*

**3. Commerce's *Final Results***

In the *Final Results*, Commerce continued to apply the new differential pricing methodology. *Final IDM* at 9 (P.R. 14).

Commerce averred that elimination of the mixed method was appropriate because it is not statutorily required to apply the mixed method. *Id.* at 10. Although Commerce acknowledged that the "statute permits a hybrid version of the two available comparison methodologies," it stated that the "new policy aligns more closely with the statutory text, which permits Commerce to use the A-T method when certain conditions set forth in section 777A(d)(1)(B) of the Act are satisfied." *Id.*

Commerce further found that discontinuation of the mixed method, in its view, "enhances the ability to address masked dumping, which is consistent with the objective of the statute, and more closely aligns with the statutory language{.}" *Id.* Yet Commerce provided no explanation as to how elimination of the mixed method did so. Instead, Commerce simply cited its "growing

experience" in applying the statutory requirements for determining what "ratio justifies application of an alternative methodology." *See id.* (citing *Stupp*, 5 F.4th at 1335).

Next, Commerce determined that a two percent threshold was a "reasonable measure of significance" because it uses a two percent threshold in other methodologies, including (1) the arm's length test to determine whether transactions between affiliated parties were made at arm's length (i.e., within a 98 percent to 102 percent range of the average, product-specific market prices to unaffiliated customers); and (2) the *de minimis* test, which requires that a dumping margin of two percent or more warrants an affirmative determination in antidumping duty investigations. *Final IDM* at 11-12 (P.R. 14).

Commerce further addressed ATC's argument regarding this Court's concerns over the P/2 test in *Mid Continent Nail*. *See Final IDM at* 10-11 (P.R. 14). Commerce distinguished the P/2 test from the price difference test, explaining that the P/2 test was used to determine whether targeted dumping exists by evaluating the weighted-average price of "targeted" sales against the that of "non-targeted" sales, while the price difference test examines whether there were significant price differences among purchasers, regions, and time periods. *See id.* at 11. This meant that the P/2 test effectively collapsed Commerce's evaluation of whether prices differed significantly (i.e., price difference test) and whether a pattern of significant price differences exists (i.e., ratio test) into a single test. *See id.*

**D. ATC's Ministerial Error Submission**

Following publication of the *Final Results*, ATC filed ministerial error comments. *See* Ministerial Error Comments (C.R. 3). ATC argued that Commerce made a programming error when calculating the antidumping margin. Specifically, the program counted ATC's U.S. customs duty expense reported in Field USDUTYU twice when calculating ATC's international

transportation expenses reported in Field USINTLMOVE. *See id.* at 2. As ATC explained, the error could be corrected by removing the second reference to USDUTYU. *See id.* at 3.

On March 11, 2026, Commerce rejected ATC's ministerial error allegation as untimely. *See* Ministerial Errors Letter (P.R. 8). According to Commerce, allegations concerning ministerial errors evident in the preliminary results must be raised in a party's case brief, and parties are required to present all arguments relevant to the final results in their case briefs. *See id.* at 1.

## III. STANDARD OF REVIEW

This Court must evaluate whether Commerce's determinations are supported by substantial evidence on the record or otherwise in accordance with law. 19 U.S.C. § 1516a.

Substantial evidence is "more than a mere scintilla," but "less than the weight of the evidence." *Hyundai Steel Co. v. United States*, 279 F. Supp. 3d 1349, 1368 (Ct. Int'l Trade 2017) (quoting *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004)). In determining whether an agency has identified substantial evidence to support its determination, the Court must consider "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting *Atlantic Sugar, Ltd. v. United States*, 744 F. 2d 1556, 1562 (Fed. Cir. 1984)); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

In determining whether Commerce's action is contrary to law, the Court must determine the statute's best reading and assess whether the agency acted within the boundaries of any discretion conferred by Congress, and engaged in reasoned decision-making within those boundaries. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394-95 (2024). In doing so, the court is not required to defer to agency interpretation if "a statute is ambiguous." *Id.* at 394.

Additionally, this Court has found Commerce's determinations unlawful "where Commerce has failed to carry out its duties properly, relied on inadequate facts or reasoning, or failed to provide an adequate basis for its conclusion." *Rhone Poulenc, Inc. v. United States*, 927 F. Supp. 451, 454 (Ct. Int'l Trade 1996). Along similar lines, the courts have concluded that "agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001). "If Commerce has a routine practice for addressing similar situations, it must either apply that practice or provide a reasonable explanation regarding why Commerce has deviated from that practice." *Jiangsu Senmao Bamboo & Wood Indus. Co., v. United States*, 698 F.Supp.3d 1277, 1282 (Ct. Int'l Trade 2024).

When reviewing Commerce determinations under the arbitrary-and-capricious standard, the Court must determine whether the agency examined the relevant record evidence and articulated a satisfactory explanation for its action. *See American Kitchen Cabinet Alliance v. United* States, 803 F. Supp. 3d 1231, 1239 (Ct. Int'l Trade 2025). The agency's explanation must demonstrate a rational connection between the facts found and the decision made. *Id*. at 1243. The Court may not sustain an agency determination that disregards material contrary evidence or fails to explain how the record supports its result. *Id*. at 1239, 1243-45.

Finally, when reviewing Commerce's use of statistical tests and numerical cutoffs, the Court must determine whether the methodology "reasonably implements a given statutory directive," *Stupp*, 5 F.4th at 1351 (quoting *Stupp Corp. v. United States*, 365 F. Supp. 3d 1373, 1378 (Ct. Int'l Trade 2019)). Commerce, in turn, must "provide an explanation that is adequate to enable the court to determine whether the choices are in fact reasonable, including as to the calculation methodologies." *Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662,

667 (Fed. Cir. 2019). That is, "Commerce still 'must {} explain {cogently} why it has exercised its discretion in a given manner.'" *Seah Steel Corp. v. United States*, 513 F. Supp. 3d 1367, 1382 (Ct. Int'l Trade 2021) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)).

## IV. ARGUMENT

### A. Commerce's Denial of a CEP Offset on U.S. Price was Unsupported by Substantial Evidence and Contrary to Law

Commerce's denial of a CEP Offset was unsupported by substantial evidence and contrary to law. As explained in **Section IV.A.1 & A.2**, ATC placed extensive qualitative and quantitative evidence demonstrating that its home market LOT was more advanced than its CEP LOT. **Section IV.A.2** further demonstrates that Commerce acted contrary to statute by grafting onto the CEP Offset analysis a separate statutory requirement applicable only to LOT Adjustments. In **Section IV.A.3**, Plaintiffs demonstrate how Commerce also failed to consider relevant precedent regarding the applicability of CEP Offsets. **Section IV.A.4** explains that Commerce unlawfully departed from its prior CEP Offset methodology without a reasoned explanation. Finally, **Section IV.A.5** highlights how Commerce's unexplained departure from its past practice was also arbitrary and capricious.

#### 1. Statutory and regulatory basis for CEP Offset

As discussed in **Section II.B.1** above, Section 773(a)(7)(B) requires Commerce to apply a CEP Offset when NV reflects a more advanced LOT than CEP and the record does not permit Commerce to calculate a LOT adjustment.

Specifically, Commerce examines "the selling functions performed for each customer category, and the level {of} intensity of the selling functions performed for each sales channel." *Final IDM* at 18 (P.R. 14). A proper analysis evaluates the selling process as a whole and

determines whether the differences in the nature and intensity of the functions performed place the sales at meaningfully different marketing stages. *See e.g.*, *Alloy Piping Prods., Inc. v. United States*, 33 CIT 349, 357-58 (2009).

The statute separately addresses whether a difference in LOT affects price comparability. For an LOT Adjustment, the respondent must establish a pattern of consistent price differences between sales at different LOTs in the country in which NV is determined. 19 U.S.C. § 1677b(a)(7)(A)(ii). This is **not** a requirement for a CEP Offset, which applies when the NV LOT is more advanced than the CEP LOT, **but** the available data do not provide an appropriate basis for quantifying such an adjustment. 19 U.S.C. § 1677b(a)(7)(B). Under the latter circumstance, where Commerce cannot calculate a LOT Adjustment between NV and CEP, the CEP Offset serves as the statutory alternative. *See Alloy Piping*, 33 CIT at 355 ("where a LOT adjustment is unavailable, a CEP offset to the NV may be proper. In particular, when . . . the available data does not permit a determination on whether the difference affects price availability, Commerce may make a CEP offset to the NV.") (internal quotation marks and brackets omitted).

Commerce has previously analyzed whether the NV LOT is more advanced through a two-part inquiry. Commerce first conducts a qualitative comparison of the selling activities performed in the home and U.S. markets. *See Final IDM* at 18. It may then review quantitative evidence to assess whether the reported differences are substantial enough to establish different marketing stages. *See id.* The quantitative evidence may corroborate the qualitative evidence, but it cannot substitute for Commerce's obligation to evaluate the actual selling functions and levels of intensity reflected in the record. *Alloy Piping*, 33 CIT at 357 ("the focus of the . . . CEP offset, is on selling activities and not on expenses").

### 2. ATC's Home Market sales occurred at a more advanced LOT than its CEP sales and the evidence submitted by ATC satisfied the statutory requirements for a CEP offset

The record overwhelmingly demonstrates that ATC's home market sales occurred at a more advanced marketing stage than its CEP sales. ATC reported 16 selling functions for its home-market sales, compared with only eight for its CEP sales; and provided extensive supporting documentation regarding these functions and their intensities. *See* AQR at 20-38 (C.R. 279), Exhs. A-9–A-10z (C.R. 279) ; SABQR at 7-15 (C.R. 118), Exhs. SA-6a–SA-15b (C.R. 112). Seven of the eight additional home-market functions were performed at a medium or high level of intensity. *See id.* at Exh. A-9 (C.R. 279). To the degree that ATC performed selling functions common to both markets, it did so at a greater intensity for home-market sales. *See id.* Commerce acknowledged these facts in the *Final Results* but concluded that the differences were insufficient to establish different marketing stages. *Final IDM* at 21 (P.R. 14). As demonstrated below, that conclusion was unsupported by substantial evidence and contrary to law.

Specifically, Commerce's refusal to grant ATC a CEP Offset was based on its conclusion that ATC did not provide sufficient quantitative data to support a finding of price differences. *Id.* at 20. This conclusion misconstrues the statute: ATC was not required to quantify such differences to establish entitlement to a CEP Offset. *See Universal Tube & Plastic Indus., Ltd. v. United States*, 586 F. Supp. 3d 1312, 1324–25 (Ct. Int'l Trade 2022). Specifically, as discussed above, the CEP Offset provision applies when the available data do not permit Commerce to apply an LOT Adjustment. 19 U.S.C. § 1677b(a)(7)(B).

Requiring a respondent to quantify how the difference between the NV LOT and CEP LOT affects price comparability, as Commerce did here, improperly imposed the evidentiary requirement governing an LOT Adjustment on the statutory alternative designed for

circumstances in which such quantification is unavailable. *See e.g.*, *Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1305 (Fed. Cir. 2001); *Universal Tube*, 585 F.Supp.3d at 1319. The plain language of § 1677b(a)(7) is clear – price comparability is only a factor when determining whether to grant an LOT Adjustment, pursuant to § 1677b(a)(7)(A)(ii); and Commerce will only consider granting a CEP Offset under the separate statutory provision of § 1677b(a)(7)(B), where the data do not support granting an LOT Adjustment. *Compare* 19 U.S.C. § 1677b(a)(7)(A) *with* § 1677b(a)(7(B).

Because Commerce effectively imposed the language and legal requirement of one statutory provision onto a separate, distinct statutory provision, it violated the both the plain language and the structure of the statute; its decision as a result of doing so is therefore contrary to law. *See Loper Bright*, 603 U.S. at 374 ("Courts interpret statutes . . . based on the traditional tools of statutory construction"); *Ventura Coastal, LLC v. United States*, 736 F. Supp. 3d 1342, 1356 (Ct. Int'l Trade 2024) (defining the "traditional tools of statutory interpretation" as "the statute's text, structure, and legislative history, and the relevant canons of interpretation") (quoting *Delverde, SrL v. United States*, 202 F.3d 1360, 1363 (Fed. Cir. 2000)) (internal quotation marks omitted).

Nevertheless, ATC provided substantial quantitative evidence corroborating the qualitative differences in selling functions. ATC reported that its total home-market indirect selling expenses were more than [ ] times its U.S. indirect selling expenses. AQR at 42. Expressed as a percentage of sales, the home-market indirect selling expense ratio was more than [ ] times the U.S. ratio, specifically [ ] for home-market sales compared with [ ] for U.S. sales. *Id.* These expense ratios corroborated the fact that ATC's selling function efforts were materially greater in the home market.

Commerce rejected this evidence in part because ATC did not report indirect selling expenses by distribution channel, quantify expenses for individual selling functions, or establish that each reported intensity level varied proportionately with its indirect selling expenses. *See Final IDM* at 20. Such reasoning demanded a degree of attribution that Commerce's CEP Offset framework does not require under the statute. ATC explained that it did not maintain selling expenses by individual function in its ordinary books and records, and supplied contemporaneous source documents supporting individual activities and overall indirect selling expense ratios corroborating the substantial difference in selling efforts between both markets. *See* AQR at 42-43 (C.R. 279), Exhs. A-9–A-10z (C.R. 279); *see also* ATC Case Brief at 17-20 (C.R. 9). Commerce could not disregard that evidence merely because ATC's accounting system did not isolate the cost of each function. *See Universal Tube*, 586 F. Supp. 3d at 1324-25 (rejecting Defendant's arguments that the respondent failed to provide sufficient quantitative evidence because Commerce "did not address the record evidence as a whole.").

Commerce also denied a CEP Offset because ATC purportedly failed to show how differences in selling expenses affected price comparability, which was not only unreasonable, but as discussed above, contrary to the express language of the statute. Commerce itself stated that a CEP Offset is warranted when the NV LOT is more advanced and "there is no basis for determining whether the difference in LOTs between NV and CEP affects price comparability." *Final IDM* at 17–18. Because ATC had only one home-market LOT, the record did not contain sales at another home-market LOT from which ATC could establish a pattern of consistent price differences. The absence of such data is therefore a statutory condition **<u>for</u>** the CEP offset, not a valid reason to deny it. *See* 19 U.S.C. § 1677b(a)(7)(A)(i), (ii); *see also Andaman Seafood Co. v.*

*United States*, 35 CIT 451, 462, 768 F. Supp. 2d 1315, 1325 (2011). This further rendered Commerce's denial of a CEP Offset unsupported by the record.

**3. Commerce failed to address precedent supporting a CEP offset on comparable facts**

This Court has repeatedly required Commerce to address meaningful differences between selling functions rather than dismiss them without adequate explanation, as it did here. In *Nexteel Co. v. United States*, the Court remanded Commerce's denial of a CEP Offset because Commerce failed to address the respondent's claim that it performed several selling functions at a high level in the home market and at a low level in the U.S. market. *See* 569 F. Supp. 3d 1354 (Ct. Int'l Trade 2022). ATC presented the same type of evidence here, identifying selling functions performed exclusively in the home market versus those performed in both markets at materially different levels of intensity.

Similarly, in *Mittal Steel USA, Inc. v. United States*, the Court sustained Commerce's granting of a CEP Offset based on evidence that the respondents performed substantially more selling activities in the home market, while their U.S. affiliates performed most of the downstream U.S. selling functions. *See* 31 CIT 1395, 1409-10 (2007). Here, YOHTA independently performed U.S. forecasting, promotion, market research, customer training, warehousing, inventory, and warranty functions, whereas ATC itself performed those activities for its home-market customers. SABQR at 5–19 (C.R. 118).

The Court's decisions in the *Husteel* line of cases are also instructive. In *Husteel Co. v. United States*, the Court remanded Commerce's denial of a CEP Offset for further explanation or reconsideration. *See* 463 F. Supp. 3d 1334 (Ct. Int'l Trade 2020). On remand, Commerce determined that a CEP Offset was warranted because the exporter performed numerous selling functions in the comparison market that it did not perform in connection with CEP sales, and the

Court sustained Commerce's redetermination. *Husteel Co. v. United States*, 494 F. Supp. 3d 1287 (Ct. Int'l Trade 2021). The same distinction exists here: ATC performed numerous functions for home-market customers that were absent from its sales to YOHTA, or which YOHTA independently performed at the CEP LOT.

**4. Commerce failed to explain its departure from prior, consistent treatment of ATC**

Commerce granted ATC a CEP Offset in the original investigation and subsequent administrative reviews, and even acknowledged those earlier determinations in the *Final Results*. *Final IDM* at 20, n.76 (P.R. 14). As explained below, Commerce's inconsistent treatment across reviews renders its decision unsupported by substantial evidence.

Specifically, Commerce did not identify a material change in ATC's selling functions justifying its change in approach. ATC reported that its selling functions for home market and CEP sales remained substantively comparable to those in the prior segments. AQR at 44 (C.R. 279). Indeed, ATC explained that its home market activities had continued to increase while its activities related to U.S. sales remained largely the same. *Id.* at 43-45. Commerce did not identify any change that would justify why evidence sufficient to support a CEP Offset in prior segments could no longer do so.

It is well-established that "agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." *SKF USA Inc.*, 263 F.3d at 1382. Here, beyond being "similar," the facts and circumstances surrounding ATC's selling activities (and thus, its right to a CEP Offset) were not just similar to those in prior reviews – they even more so supported granting a CEP Offset because, as noted immediately above, the intensity of ATC's home market LOT selling functions increased, while that of its CEP LOT selling functions remained static. Thus, the degree and nature of ATC's evidence remained relatively consistent.

Rather, Commerce changed what it considered sufficient evidence. It demanded channel-specific indirect expenses, selling-function-specific cost attribution, and a proportional link between expense amounts and claimed intensity levels. *Final IDM* at 20-21 (P.R. 14).

As discussed above in **Section IV.A.2**, in doing so, Commerce acted in a manner, and reached a conclusion, that was unsupported by substantial evidence and contrary to law. And also in doing so, Commerce treated an identical situation differently – an act that is inherently arbitrary and consequently, unsupported by substantial evidence. *See, e.g.*, *Changzhou Hawd Flooring Co. v. United States*, 848 F.3d 1006, 1011 (Fed. Cir. 2017).

#### 5. Under this Court's precedent, Commerce's failure to explain its apparent change in CEP Offset practice was arbitrary and capricious

The arbitrariness of Commerce's decision to deny ATC a CEP Offset is not limited to the fact that Commerce treated like situations differently. To be clear, Commerce may modify its policies and practices. But it may not depart from an established practice without acknowledging the departure and providing a reasoned explanation. *Jiangsu Senmao*, 698 F.Supp.3d at 1282.

In doing so here, Commerce violated court precedent finding that the failure to explain a change in methodology is arbitrary and capricious. For example, in *Trustees in Bankruptcy of North American Rubber Thread Co. v. United States*, the Court explained that Commerce acts arbitrarily and capriciously when it has "consistently followed a contrary practice in similar circumstances and provided no reasonable explanation for the change in practice." 31 CIT 2040, 2044, 533 F. Supp. 2d 1290, 1295 (2007) (quoting *Consolidated Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003)). The Court further emphasized that an agency is obligated to follow its practice or explain why it has chosen to change course. *Id.* (citing *British Steel PLC v. United States*, 127 F.3d 1471, 1475 (Fed. Cir. 1997)).

This requirement serves a fundamental purpose. When Commerce departs from its practice, it must "clearly set forth" the grounds for doing so, which enables the reviewing court to understand the basis for Commerce's decision and evaluate whether that decision is consistent with the agency's statutory mandate. *Trustees in Bankruptcy*, 31 CIT at 2047, 533 F. Supp. 2d at 1297 (quoting *Hangzhou Spring Washer Co. v. United States*, 29 CIT 657, 667, 387 F. Supp. 2d 1236, 1246 (2005)). Although Commerce has discretion to adapt its methodology to the circumstances of a particular proceeding, it must explain any decision to do so and support it with substantial evidence. *Id*. (citing *Save Domestic Oil, Inc. v. United States*, 26 CIT 1380, 1395, 240 F. Supp. 2d 1342, 1357 (2002)).

Commerce did not do so here. During the investigation and prior administrative reviews, Commerce granted ATC a CEP Offset based on ATC's selling functions chart, narrative descriptions of selling functions, sales-process documentation, channels-of-distribution information, and customer categories. *See* ATC Case Brief at 20-21 (C.R. 9). Those earlier determinations establish that Commerce considered this type and quantum of evidence sufficient to evaluate ATC's selling activities in and determine that the home-market LOT was more advanced than the CEP LOT.

In the POR7 review, ATC submitted more detailed evidence concerning the relevant selling functions, including a quantitative analysis in the form of indirect selling expense ratios, which demonstrated that ATC performed more selling functions, at a higher level of intensity for home-market customers, and fewer and less intensive selling functions with respect to CEP sales. *See* AQR at 42-43 (C.R. 279). Commerce nevertheless concluded that the record was insufficient due to the absence of a quantitative analysis connecting indirect selling expenses to the claimed differences in selling functions and marketing stages, and which justified price

differences – the last of which, again, the statute requires for an LOT Adjustment, not a CEP Offset. *See Final IDM* at 20-21 (P.R. 14).

That conclusion reflects an unexplained change in what Commerce considers sufficient evidence justifying a CEP Offset. In the investigation and prior reviews, Commerce treated evidence of differences in indirect selling expenses and levels of intensity as adequate. *See* ATC Case Brief at 21 (C.R. 9). In the POR7 review, it demanded a new, additional quantitative analysis. Commerce therefore did not simply reach a different conclusion on a different record; it fundamentally changed the evidentiary threshold governing the same issue in successive segments of the same proceeding.

This Court's prior decisions make clear that, by doing so, Commerce was required to acknowledge the change and explain why the earlier standard was no longer adequate. *See, e.g.*, *Consolidated Bearings*, 348 F.3d at 1007; *British Steel*, 127 F.3d at 1475; *Jiangsu Senmao*, 698 F.Supp.3d at 1282; *Trustees in Bankruptcy*, 31 CIT at 2047, 533 F. Supp. 2d at 1297; *Hangzhou Spring Washer Co. v. United States*, 29 CIT at 667, 387 F. Supp. 2d at 1246; *Save Domestic Oil, Inc. v. United States*, 26 CIT at 1395, 240 F. Supp. 2d at 1357. Here, it did neither. Commerce did not identify a material difference between the relevant sales structure or selling activities in this review and those examined in the investigation and prior reviews. Nor did it explain why evidence previously sufficient to establish differences in selling functions suddenly failed to do so. As in *Trustees in Bankruptcy*, Commerce's failure to confront or distinguish its prior determinations deprives the Court of any basis to determine whether the new standard represents a reasonable application of agency expertise or merely inconsistent decision-making. 31 CIT at 2044-47, 533 F. Supp. 2d at 1295–97.

Commerce's determination also fails under the broader arbitrary-and-capricious standard articulated in *Shandong Dongfang Bayley Wood Co. v. United States*, 375 F. Supp. 3d 1339 (Ct. Int'l Trade 2019). An agency acts arbitrarily when it "entirely fail{s} to consider an important aspect of the problem," offers an explanation that "runs counter to the evidence before the agency," or supplies a rationale "so implausible that it cannot be attributed to a difference in view or agency expertise." *Shandong*, 375 F. Supp. 3d at 1344 (quoting *Motor Vehicle Manufacturers Ass'n*, 463 U.S. at 43). Commerce's treatment of its own prior determinations was an important aspect of the problem, because those determinations established the baseline against which to evaluate its decision here.

Accordingly, Commerce's denial of the CEP Offset – in addition to being contrary to law and unsupported by substantial evidence – was arbitrary and capricious. The Court should remand the determination with instructions that Commerce either: (1) apply the evidentiary standard it used in the investigation and prior reviews and grant the CEP Offset based on the record evidence; or (2) identify a material factual distinction or provide a reasoned, record-supported explanation for changing what constitutes sufficient evidence. If Commerce cannot provide such an explanation, it must follow its prior practice. *See Trustees in Bankruptcy*, 31 CIT at 2044-47, 533 F. Supp. 2d at 1297–98.

### B. Commerce's Differential Pricing Analysis for Determining Targeted Dumping Was Unreasonable

In the *Final Results*, Commerce defended its use of a two percent threshold on the grounds that it uses that threshold in other methodologies, including the arm's length test for determining whether transactions between affiliated companies were made at fair market value; and the *de minimis* threshold to determine whether the levels of dumping should result in the application of antidumping duties. *See Final IDM* at 11. (P.R. 14). Yet, as explained below in

**Section IV.B.1**, when applied in the differential pricing context, the two percent threshold fails to account for sample sizes and improperly uses passed data to pass additional data, and therefore is not reasonable.

Commerce further justified its elimination of the mixed comparison methodology because it was not statutorily required, and claimed that such elimination better aligned its differential pricing analysis with the statutory requirements in § 1677f-1(d)(1)(B), as well as "enhanced" its ability to address masked dumping. *See Final IDM* at 10. As demonstrated in **Section IV.B.2** below, Commerce failed to provide an explanation to support these findings, let alone an adequate one, rendering such elimination likewise unreasonable. *See id.*; *see also Mid Continent Steel*, 940 F.3d at 667.

### 1. Commerce's application of a two percent threshold produces unreasonable results because it fails to account for sample sizes and improperly uses passed data to pass additional data

In *Marmen*, the Federal Circuit vacated Commerce's use of Cohen's *d* and explained that any replacement could be based on "a statistical analysis . . . as long as the resulting analysis is itself **justified as sound for gauging differences in the data sets at issue**." 134 F.4th at 1348 (emphasis added). Yet Commerce's two percent threshold for the price difference test produces unreasonable results through technical absurdities, thereby contradicting the Federal Circuit's directive and making it unsuitable for purpose of determining targeted dumping in accordance with 19 U.S.C. § 1677f-1(d)(1)(B).

#### a. Explanation of the steps in Commerce's differential pricing methodology

The first two steps of Commerce's differential pricing analysis (i.e., the price difference test and the ratio test) can be broken down into five mathematical steps, as follows:

**Step 1 (Price difference test):** Commerce calculates the total net value[3] and the total quantity sold, by control number ("CONNUM"),[4] for every region,[5] period,[6] and customer.[7] Region, period, and customer form the bases for the following steps in the methodology.

**Step 2:** Each grouping is categorized into the three bases by CONNUM to determine whether significant price differences exist. For example, all transactions of a single CONNUM are split into sales by (1) region; (2) period; and (3) customer.

**Step 3:** Third, for each CONNUM, the total net value and the total quantity sold for the entire CONNUM (calculated in Step 1) is reduced by the CONNUM-basis pairs calculated in Step 2. The resulting difference is defined as the "base group," while the values that are to be

---

[3] Memorandum to The File, through Alice Maldonado, Re: 2023-2024 Antidumping Duty Administrative Review of Certain New Pneumatic Off-the-Road Tires from India: Preliminary Results Analysis Memorandum for ATC Tires Private Limited ("Preliminary Calculation Margin Program"), Att. 2 (July 5, 2025) ("U.S. SALES MARGIN PROGRAM - OTR Tires FROM India (01MAR2023 - 29FEB2024), AR7 Prelim FOR RESPONDENT ATC (A-533-869), THE DIFFERENTIAL PRICING TEST, NET PRICE CALCULATIONS AND PURCHASER/TIME/REGION ASSIGNMENTS FOR DIFFERENTIAL PRICING") (preliminary calculation sustained in the *Final Results*) (C.R. 17).

[4] "The term 'control number' or 'CONNUM' denotes a unique product based on relevant physical characteristics. To ensure that Commerce is comparing like products in the home and U.S. markets, it asks respondents to sort merchandise according to key differentiating categories, with each number in the product's control number corresponding to physical characteristic groupings particular to the merchandise under review." *Officine Tecnosider SRL v. United States*, 798 F. Supp. 3d 1363, 1368 n.4 (Ct. Int'l Trade 2025) (quoting *Xi'an Metals & Minerals Imp. & Exp. Co. v. United States*, 520 F. Supp. 3d 1314, 1321 n.4 (Ct. Int'l Trade 2021)).

[5] "Region" is reported as either a delivery zip code or state. These values are then organized by larger regions (e.g., South, West, Northeast, Midwest, etc.). For example: "CT," "ME," "MA," "NH," "RI," "VT," "NJ," "NY" and "PA" are considered the Northeast region, while Puerto Rico and the Virgin Islands are considered separately. *See* Preliminary Calculation Margin Program.

[6] "Period" is defined as the quarter in which the product was sold. *See id.*

[7] "Purchaser" is defined as the customer, most commonly by the customer code, to whom the product was sold. *See id.*

subtracted in Step 2 are considered the "test group." If in any pair-wise test there are no observations in either the base group or the test group, the test is not conducted.

**Step 4:** Fourth, the average price (i.e., total value divided by total quantity) for the base group ("b") and test group ("t") are calculated. If the following is true, then all sales in the test group are considered to have passed (i.e., test group differs from the base group by at least +/- two percent):

$$\left|\frac{\overline{x}_b - \overline{x}_t}{\overline{x}_b}\right| \geq 0.02$$

$$\begin{gathered} where: \\ \overline{x}_b \; denotes\ the\ average\ unit\ price\ of\ the\ base\ group \\ \& \\ \overline{x}_t \; denotes\ the\ average\ unit\ price\ of\ the\ test\ group \end{gathered}$$

**Step 5 (Ratio test):** If 33 percent or more of the transactions pass (by value), Commerce will zero all transactions. That is, Commerce will "deny{} offsets to positive dumping margins for non-dumped sales by assigning a value of zero to the comparison result." *Final IDM* at 6 (P.R. 14). Commerce does not "zero" when calculating dumping margins under the A-A method. *Id.*

The following example illustrates these steps:

| CONNUM 01-02-03 w.r.t Period | | | | | | |
|---|---|---|---|---|---|---|
| | **Net Price (A)** | **Quantity (B)** | **Total Value (C=A*B)** | **Base Group (D)** | **2% Test** | **Pass/ No Pass (F)** |
| Full Year | $ 100.00 | 8.00 | $ 800.00 | NA | NA | NA |
| | | | | | | |
| Q1 | $ 101.00 | 2.00 | $ 202.00 | $ 99.67 | -1.338% | NO PASS |
| Q2 | $ 102.50 | 2.00 | $ 205.00 | $ 99.17 | -3.361% | PASS |
| Q3 | $ 98.25 | 2.00 | $ 196.50 | $ 100.58 | 2.320% | PASS |
| Q4 | $ 98.25 | 2.00 | $ 196.50 | $ 100.58 | 2.320% | PASS |
| *Tot.* | | 8.00 | $ 800.00 | | | |

In the above table, eight units of CONNUM 01-02-03 were sold for a total value of USD 800 during full year, with each unit sold for USD 100. In each of the four quarters, two units were sold. The average net unit price ("AUP") in the first quarter was USD 101 per unit, the AUP in the second quarter was USD 102.50 per unit, and the AUPs in the third and fourth quarters were USD 98.25 per unit. These AUPs constitute the test groups for the two percent price difference test.

The base group averages for each quarter are calculated by taking the weighted average of all other fields. For example, the base group average (D) for the first quarter is USD 99.67. This is calculated by taking the total value of the CONNUM (USD 800), minus the total extended value of the first quarter (USD 202), divided by the total quantity of the CONNUM (eight units) minus the total quantity for the first quarter (two units). The calculation is mathematically equivalent to taking the weight average of all quarters except the first quarter:

$$Base\ Group_{Q1} = \frac{(\$800 - \$202)}{(8\ units - 2\ uinits)} = \$99.67/unit$$

When the two percent formula from <u>Step 4</u> is applied to the base group average for Q1, it results in the following:

$$\left|\frac{\bar{x}_b - \bar{x}_t}{\bar{x}_b}\right| = \frac{\$99.67 - \$101}{\$99.67} = -1.338\%$$

As the absolute value of -1.34% is less than 2.00%, the transactions in the first quarter are considered to have "not passed," and therefore, are not included toward the 33 percent threshold for zeroing.

The base group average for the second quarter is calculated as follows:

$$Test\ Group_{Q2} = \frac{(\$800 - \$205)}{(8\ units - 2\ uinits)} = \$99.17/unit$$

When the two percent formula is applied to the base group average for Q2, it results in the following:

$$\left|\frac{\bar{x}_b - \bar{x}_t}{\bar{x}_b}\right| = \frac{\$99.17 - \$102.50}{\$99.17} = -3.361\%$$

Here, because the absolute value of -3.36% is greater than 2.00%, the transactions in the second quarter are considered to have "passed," and are thus included toward the 33 percent threshold for zeroing. In the example provided above, the second, third, and fourth quarters all pass (i.e., exceed the two percent threshold). By total value, USD 598 (the sum of the total value of the last three quarters) out of USD 800 of sales (by time period) are considered passing.

Commerce repeats the same process for every CONNUM, and using different grouping, including on a customer basis (comparing each customer to the weight average total of sales to all other customers) and a region basis (comparing one region of the United States to all other regions). A transaction that passes under any bases (grouping) is considered to have passed. This means that the six units sold during Q2–Q4 in the table above will be considered passing for the purposes of the 33 percent threshold, regardless of whether the transactions pass or do not pass when testing by customer or region groupings.

Assuming that CONNUM 01-02-03 is the only CONNUM, USD 598 (the total value of Q2 to Q4) out of the total USD 800, or 74.75 percent of sales, are considered to have "passed" the two percent threshold in Commerce's price difference test. Commerce will therefore zero all transactions per the ratio test, as 74.75 percent exceeds the 33 percent threshold of passing sales.

#### b. Commerce's new differential pricing analysis results in technical absurdities

As explained below, Commerce's new methodology suffers from two significant mathematical issues: (1) it does not properly account for the relative sizes of the groups being tested; (2) it reuses passing data to pass additional data, thereby resulting in incoherent results. Such results demonstrate that Commerce's new methodology fails to adhere to the *Marmen's* directive, requiring a methodology that is "justified as sound for gauging differences in the data sets at issue." 134 F.4th at 1348.

##### i. The methodology does not properly consider sample sizes

The formula used to examine whether a specific level of a test group (e.g., a single quarter of the period basis, a single customer of the purchaser basis, or a single location in the United States of the region basis) exceeds two percent of the base group fails to consider the sample sizes between the levels of a base group (e.g., between Q1 and Q2). For example:

| CONNUM 01-02-03 w.r.t Period | | | | | | |
|---|---|---|---|---|---|---|
| | Net Price (A) | Quantity (B) | Total Value (C=A*B) | Base Group (D) | 2% Test | Pass/ No Pass (F) |
| Full Year | $ 100.00 | 8.00 | $ 800.00 | NA | NA | NA |
| Q1 | $ 100.30 | 7.00 | $ 702.10 | $ 97.90 | -2.451% | PASS |
| Q2 | $ 97.90 | 1.00 | $ 97.90 | $ 100.30 | 2.393% | PASS |
| Q3 | NA | NA | NA | NA | NA | NA |
| Q4 | NA | NA | NA | NA | NA | NA |
| *Tot.* | | 8.00 | $ 800.00 | | | |

In the example above, all eight transactions were sold only in the first and second quarters. In the first quarter seven units were sold, and in the second quarter, a single unit was sold. When the two percent test is applied here, it does not take into account the relative size of the second quarter vis-à-vis the first quarter.

Concern over sample size has been a repeated concern in the precedent of this Court and the Federal Circuit regarding differential pricing. For example, in *Matra Ams., LLC v. United States* (decided before the Federal Circuit decided *Marmen*), this Court explained that Commerce had failed to account for "the Federal Circuit's concerns about normality, sample size, and variance" in the context of the Cohen's *d* test. *See* 681 F. Supp. 3d 1339, 1363-64, 1363 n.12. The Federal Circuit in *Marmen* termed these three statistical assumptions as those of "normal distributions," (i.e., normality) "equal variability," (i.e., variance) and "sufficiently numerous data" (i.e., sample size) and overturned Cohen's *d* because Commerce utilized that test even when the underlying data did not satisfy these assumptions. *See* 134 F.4th at 1343-48.

Here, the fact that the new test does not take sample size into account means that **<u>any number of units</u>** can be sold in Q1 that will pass the single unit of sale in Q2, regardless of whether there were 10 units sold for USD 100.30 per unit in Q1, 100 units sold for USD 100.30 per unit in Q1, or 10,000 units sold for USD 100.30 in Q1. And that, in turn, renders the test unsound "for gauging differences in the data sets at issue." *Marmen*, 134 F.4th at 1348. The underlying formula illustrates this point:

$$\left|\frac{|\overline{x}_b - \overline{x}_t|}{\overline{x}_b}\right| \geq 0.02$$

All components of the above formula are averages, based on the sample size of their own groupings; the formula does not account for the relative differences between the base and test groups. This issue is not limited to the above example. Under Commerce's new methodology, there are innumerable ways the data can be constructed to demonstrate that unequal sizes between the levels lead to unreasonable results. For example:

| CONNUM 01-02-03 w.r.t Period | | | | | | |
|---|---|---|---|---|---|---|
| | Net Price (A) | Quantity (B) | Total Value (C=A*B) | Base Group (D) | 2% Test | Pass/ No Pass (F) |
| Full Year | $ 99.62 | 50.00 | $4,981.20 | NA | NA | NA |
| Q1 | $ 99.50 | 47.00 | $4,676.50 | $ 101.57 | 2.035% | PASS |
| Q2 | $ 109.70 | 1.00 | $ 109.70 | $ 99.42 | -10.342% | PASS |
| Q3 | $ 97.50 | 1.00 | $ 97.50 | $ 99.67 | 2.175% | PASS |
| Q4 | $ 97.50 | 1.00 | $ 97.50 | $ 99.67 | 2.175% | PASS |
| *Tot.* | | 50.00 | $4,981.20 | | | |

Using Commerce's methodology, **47 units** sold for USD 99.50 each in **the first quarter alone** would be tested against the **three units** sold **across the last three quarters** to determine whether the first quarter passes the two percent threshold. When this test is applied, Q1 exceeds the two percent threshold at 2.035 percent, which results in the **passing of all Q1 sales**.

However, because Commerce's methodology fails to account for differences in sample sizes, Q1 would pass even if 49,997 units were sold in the first quarter at USD 99.50 per unit and 3 units were sold in the remaining three quarters at different unit prices. Such comparisons are absurd on their face. Indeed, the total for Q1 could equal USD 4,974,701.50 (i.e., 49,997 units sold in the first quarter) and still pass under Commerce's methodology because the total quantity of Q2–Q4 of 3 units, or 0.006% percent of the total quantity sold, is sufficient to pass 100 percent of the sales for this particular CONNUM.

This example again demonstrates why a methodology that ignores sample sizes of the data, thereby treating statistically dissimilar situations as equivalent, cannot be considered "justified as sound for gauging differences in the data sets at issue." *Marmen*, 134 F.4th at 1348. Accordingly, Commerce's methodology was unreasonable as it fails to meet the Federal Circuit's directive in *Marmen*. *See Stupp*, 5 F.4th at 1351.

### ii. Using passed data to pass additional data generates incoherent results

In addition to Commerce's failure to account for sample sizes between levels, its use of passing data to pass additional data causes incoherent results. For example:

| CONNUM 01-02-03 w.r.t Period | | | | | | |
|---|---|---|---|---|---|---|
| | Net Price (A) | Quantity (B) | Total Value (C=A*B) | Base Group (D) | 2% Test | Pass/ No Pass (F) |
| Full Year | $ 99.88 | 8.00 | $ 799.00 | NA | NA | NA |
| | | | | | | |
| Q1 | $ 101.00 | 2.00 | $ 202.00 | $ 99.50 | -1.508% | NO PASS |
| Q2 | $ 102.50 | 2.00 | $ 205.00 | $ 99.00 | -3.535% | PASS |
| Q3 | $ 98.00 | 2.00 | $ 196.00 | $ 100.50 | 2.488% | PASS |
| Q4 | $ 98.00 | 2.00 | $ 196.00 | $ 100.50 | 2.488% | PASS |
| *Tot.* | | 8.00 | $ 799.00 | | | |

In this example, only the first quarter does not pass the two percent test, while the remaining quarters pass the two percent test. The Q1 transactions did not pass the two percent test because the groups of transactions that they are being tested against, namely the AUPs of the last three quarters, are within two percent of the Q1 AUP of USD 101.

This means that the first quarter sales did not pass despite these sales being compared to **only** passing sales, while sales from the other three quarters are considered to have passed even though they are being tested against sales that did not pass. Because Commerce uses the group of passing sales in Q2–Q4 to generate a benchmark that causes the Q1 sales to fail the two percent test, Commerce's new methodology essentially creates a cascading effect, in which results of the price difference test are built on an unsound foundation – thereby making it unreasonable in its application and unsuitable in gauging price differences in data sets as required by *Marmen*. *See* 134 F.4th at 1348.

**c. The two percent threshold is overly rigid and unreasonable when applied**

In addition to producing arbitrary results, the new two percent threshold is overly rigid to reasonably determine whether significant price differences exist among time periods, regions, and customers. In *Mid Continent Nail*, this Court expressed concerns over a similar methodology, the P/2 test, explaining that the use of a strict two percent threshold to evaluate whether a pattern of significant difference existed, could capture too many or too few sales, depending on the price variations in the market. 712 F. Supp. 2d at n.10, 1378.

As discussed above in **Section II.C.2**, ATC raised this concern with Commerce, which dismissed it in the *Final Results*, because, as Commerce explained, the P/2 test measures whether the weighted average prices of targeted sales are two percent or less than those of non-targeted sales, while the price difference test measures whether significant price differences exist among purchasers, regions, and time periods. *See Final IDM* at 11. Commerce added that the P/2 test collapsed the pattern and significant difference test into one. *See id.*

Although Commerce's identification of the differences between the P/2 test and the two percent test is true on its face, it does not address the Court's broader concern that a two percent threshold is overly rigid. The fact remains that Commerce's new methodology employes a strict two percent threshold similar to the P/2 test, and this rigid threshold could lead to similar inaccurate determinations of whether significant price differences exist depending on the price variances of a given market. Moreover, this Court's concerns with respect to the P/2 test being overly rigid by capturing too many sales due to price variances in a market are essentially the same as the concern, discussed above in **Section IV.B.1,** that the two percent test is overly rigid because it can incorrectly capture too many sales as "masked" dumping.

Accordingly, Commerce's failure to consider the issue of the rigidity of the two percent threshold raised in ATC's case brief was unreasonable, given that "{a}n administrative determination is inadequate when the agency 'entirely fails to consider an important aspect of the problem.'" *See Diamond Sawblades Manufacturers' Coal. v. United State*s, 219 F. Supp. 3d 1368, 1375 (Ct. Int'l Trade 2017) (quoting *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43). Further, given that Commerce's rigid threshold can be applied to generate overinclusive results, such a threshold cannot be considered "sound for gauging differences in the data sets at issue." *Marmen,* 134 F.4th at 1348.

**d. Commerce's reliance on other methodologies using a two percent threshold to demonstrate reasonableness for the differential pricing analysis is unreasonable**

Finally, Commerce's reliance on other methodologies that use a two percent threshold does not, and cannot, demonstrate the reasonableness of a two percent threshold for the differential pricing analysis. In the *Final Results*, Commerce explained that a "two-percent threshold is a reasonable measure of significance and is consistent with other aspects of Commerce's practice in antidumping proceedings." *Final IDM* at 11 (P.R. 14). Specifically, Commerce explained that a two percent threshold is used in the arm's length test to determine whether sales between affiliated parties "differ significantly" from market prices, and a similar threshold is used to determine whether dumping is "significant" enough to implement a dumping margin in an antidumping investigation. *Id.* at 11-12 (P.R. 14).

Taken to its logical conclusion, such superficial reasoning could apply to any of Commerce's methodologies that evaluate "significance," including those that use thresholds other than two percent. For example, even within the differential pricing analysis, Commerce employs a threshold of 25 percent in the meaningful difference test to evaluate the difference between calculating the margins using the A-A method versus the A-T method. Indeed,

Commerce also acknowledged in its *Final Results* that a 0.5 percent margin applies when evaluating whether a dumping margin crosses the *de minimis* in an administrative review, versus the two percent used in an investigation. *See Final IDM* at n.46, 12 (P.R. 14). Moreover, if the simplistic reasoning that a two percent threshold is reasonable because it is used in other contexts applies, then a threshold of 25 percent could be just as "reasonable" to determine whether price differences are "significant" in the differential pricing context.

In short, applying Commerce's logic means that a threshold of anywhere from 0.5 to 25 percent could be considered "reasonable" for determining a significant price difference. Such a conclusion shows, on its face that Commerce has failed to "explain {cogently} why it has exercised its discretion in a given manner." *See Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 48. Commerce's explanation must, at a minimum, "reasonably tie the determination under review to the governing statutory standard and to the record evidence." *See CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1376 (Fed. Cir. 2016). Commerce should be required to do so on remand and, failing that, revise its differential pricing analysis.

### 2. Commerce failed to provide a reasonable explanation for the elimination of the mixed method comparison methodology

As discussed above in **Section II.C.1**, following the decision in *Marmen*, Commerce eliminated the mixed method comparison from its differential pricing methodology. And, as discussed in **Sections II.C.2 and 3**, ATC challenged such removal, to which Commerce responded in the *Final Results* that such removal, "enhances the ability to address masked dumping . . . and more closely aligns with the statutory language that expressly authorizes the use of the A-T comparison method when the conditions set forth in section 777A(d)(1)(B) of the Act are satisfied." *Final IDM* at 10 (P.R. 14). This does not meet the standard of a reasonable explanation pursuant to this Court's precedent.

Specifically, Commerce did not elaborate as to how discontinuing the mixed method actually enhances its ability to address masked dumping, nor did it specify how such elimination is better aligned with Section 777A(d)(1)(B), which provides that an alternative method can be used if the Department explains why significant price differences exist and why this cannot be taken into account using the A-A method or T-T method.

As the Federal Circuit recognized in *Mid Continent Steel*, Commerce must "provide an explanation that is adequate to enable the court to determine whether the choices are in fact reasonable, including as to the calculation methodologies." 940 F.3d at 667. Without an adequate explanation as to why the elimination of this method is more aligned with the statutory language of section 777A(d)(1)(B) as Commerce states, this Court cannot evaluate whether Commerce's decision to eliminate the mixed method was reasonable.

Moreover, in *Stupp*, the Federal Circuit noted that the mixed method approach (i.e., of a 33 percent to 66 percent range, rather than a single cutoff at 50 percent) "provides a better fit, minimizing both the assessment of antidumping duties that are too high and the assessment of duties that are too low" and that "Commerce's cutoffs {of 33 percent to 66 percent} are reasonable in light of the alternatives." 5 F.4th at 1355. By effectively removing the 33 to 66 percent range, Commerce has established a single cutoff at 33 percent – even more rigid than the 50 percent threshold against which the Federal Circuit warned in *Stupp* – resulting in an overly punitive measure in Commerce's calculation of the dumping margin. *See id.*

It is well established that the "antidumping duty regime is intended to be remedial as opposed to punitive." *See, e.g., Apex Frozen Foods Ltd. v. United States.*, 144 F. Supp. 3d 1308, 1336 (Ct. Int'l Trade 2016) (citing *Agro Dutch Indus. Ltd. v. United States*, 508 F.3d 1024, 1027 (Fed. Cir. 2007)). At a minimum, this Court should remand Commerce's decision so that the

agency can explain how the elimination of the mixed method enhances Commerce's ability to address masked dumping when it effectively creates an overly rigid threshold that can result in an unreasonably high – and therefore punitive – dumping margin.

### C. Commerce's Decision to Reject Ministerial Errors as Untimely Was Contrary to Law

As discussed in **Section II.D** above, Plaintiffs submitted ministerial error comments explaining that Commerce inadvertently counted the same expense field twice when calculating ATC's U.S. movement expenses. Ministerial Error Comments at 2-3 (C.R. 3). Commerce rejected the submission as untimely, concluding that the alleged error could have been identified from the preliminary results and therefore should have been raised in ATC's case brief. *See* Ministerial Error Letter (P.R. 8). As explained below, Commerce's rejection was unlawful.

#### 1. Section 751(h) requires Commerce to provide an opportunity to present the error in the final results

Section 751(h) of the Tariff Act directs Commerce to establish procedures for correcting ministerial errors in final determinations within a reasonable time after those determinations are issued; such procedures "shall ensure opportunity for interested parties to present their views regarding any such errors." 19 U.S.C. § 1675(h). The statute defines "ministerial error" to include errors in arithmetic functions, clerical errors arising from inaccurate copying or duplication, and other unintentional errors Commerce considers ministerial. *Id.*

ATC's allegation falls squarely within that statutory framework. Counting the same expense field twice is a duplication error, and ATC highlighted that error, asking Commerce to correct it. The allegation therefore concerned an unintentional computational error in the final margin calculation, precisely the type of error Congress intended Commerce to address through the post-final ministerial-error process. Commerce then rejected that allegation on purely procedural grounds of untimeliness, specifically because the error was discoverable at the

preliminary phase and ATC did not raise the error in its case brief, as advised by Commerce's regulation. *See* Ministerial Error Letter (P.R. 8); *see also* 19 C.F.R. § 351.224(c)(1).

This Court's recent decision in *Catfish Farmers of America v. United States* confirms that Commerce may not foreclose that statutory process merely because the same alleged error might have been discoverable at the time of issuance of the preliminary results. *Catfish Farmers of America v. United States,* 815 F. Supp. 3d 1339 (Ct. Int'l Trade 2025). In the administrative review underlying *Catfish Farmers*, Commerce rejected a ministerial error allegation on the ground that the alleged error had been discoverable immediately after the preliminary results, but had not been included in the petitioners' case brief. 815 F. Supp. 3d at 1348. The Court held that this reasoning was inconsistent with Section 751(h). *Id.* at 1350.

As the Court explained, Section 751(h) is expressly directed to ministerial errors "in final determinations." *Id.* The statute requires Commerce to "ensure" that interested parties have an opportunity to present their views regarding "any" such errors. *Id.* (quoting Section 751(h) of the Tariff Act). Those terms do not authorize Commerce to divide ministerial errors in final determinations into (1) errors that may be raised after the final results and (2) errors that are barred because they could have been discovered earlier. *See id.* Such an interpretation would allow parties to raise only some ministerial errors in final determinations, contrary to Congress's use of the unqualified term "any." *See id.*

The same reasoning controls here. Commerce could not lawfully deem ATC's ministerial errors submission untimely solely because the error was discoverable in the *Preliminary Results*. Regardless of when it was discoverable, ATC alleged the error in a manner consistent with Section 751(h), which in turn required Commerce to accept the allegation, place it on the administrative record, and assess it on the merits.

Specifically, Commerce failed to adhere Section 751(h) when it: (1) did not determine whether the ministerial error alleged by ATC was "in a final determination of the type identified in the statute," and (2) did not "ensure" that ATC had the 'opportunity . . . to present {its} views regarding' what {it} alleged to be ministerial error in the final determination." *Id.* at 1350. Accordingly, Commerce's rejection of ATC's ministerial error allegation violated the explicit statutory requirements laid out in Section 751(h) and was therefore contrary to law. *See Loper Bright*, 603 U.S. at 394-95, 412-13; *Ventura Coastal*, 736 F. Supp. at 1356.

**2. Commerce cannot nullify a statutory right through application of its regulation**

In rejecting ATC's ministerial error allegation, Commerce cited its regulation for the proposition that ATC should have raised the error in its case brief, such that the allegation was untimely. *See* Ministerial Error Letter (P.R. 8). Yet Commerce's regulations reinforce, rather than eliminate, ATC's right to raise the error after disclosure of the final calculations.

Specifically, Section 351.224(c)(1) provides that a party to whom Commerce has disclosed calculations performed in connection with the final results of a review "may submit comments concerning any ministerial error in such calculations." 19 C.F.R. § 351.224(c)(1). Section 351.224(c)(2), in turn, requires such comments to be filed within five days after Commerce releases the relevant disclosure documents.

Although Section 351.224(c)(1) also states that comments concerning ministerial errors made in preliminary results "should" be included in a party's case brief, that language does not provide a basis for rejecting an otherwise timely allegation. First, "should" is not "must." Second, the regulation separately and expressly permits comments concerning "any" ministerial error in the final calculations. Third, any ambiguity in Commerce's regulatory scheme must be

resolved consistently with Section 751(h) of the statute, which guarantees an opportunity to present views concerning ministerial errors in final determinations.

Indeed, this Court recognized this distinction in *Catfish Farmers*. It explained that the regulation could be read as establishing separate procedures for preliminary and final calculations, with the provision specific to final determinations taking precedence over the more general case-brief requirement in 19 C.F.R. § 351.309(c)(2). 815 F. Supp. 3d at 1349-50. More fundamentally, the Court held that, even if Commerce's contrary interpretation of its regulations might appear reasonable when considered in isolation, an agency interpretation cannot stand when it conflicts with the governing statute. *Id.* at 1350.

Commerce therefore cannot rely on Section 351.309(c)(2) (as it did in the Ministerial Error Letter), which generally requires case briefs to include arguments that remain relevant to the final results, in order to nullify the specific post-final procedure mandated by Section 751(h) of the statute and implemented through Section 351.224 of the regulation. Commerce cannot use a general regulatory rule regarding case briefs to displace and nullify a specific, statutorily-enumerated right to identify ministerial errors after issuance of a final determination.

Because ATC filed its Ministerial Error comments within five days after Commerce disclosed the final calculations, ATC complied with the only express filing deadline applicable to ministerial errors alleged in those calculations. Commerce had no lawful basis to treat ATC's submission as untimely. *See Catfish Farmers*, 815 F. Supp. 3d at 1350 (citing *Loper Bright* to hold that Commerce did not act within its statutory authority when rejecting the ministerial error allegation in accordance with Section 751(h)).

## V. CONCLUSION AND RELIEF SOUGHT

For the reasons discussed above, Plaintiffs respectfully request that the Court:

1) Enter judgment in favor of Plaintiffs;

2) Hold and declare that Commerce's denial of a CEP Offset was unsupported by substantial evidence and contrary to law;

3) Hold and declare that Commerce's differential pricing methodology was unreasonable and unsupported by substantial evidence;

4) Hold and declare that Commerce's decision to reject ATC's ministerial error allegations as untimely was contrary to law;

5) Remand this matter to Commerce to reconsider the Final Results, and to issue revised Final Results in conformity with the Court's decision; and

6) Grant Plaintiffs such additional relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Eric C. Emerson
Eric C. Emerson
Ron Kendler
Katherine Shin
Nicole Arellano-Brillembourg

STEPTOE LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000

Attorney for Plaintiffs ATC Tires Private Ltd., Plaintiff ATC Tires AP Private Ltd. and Yokohama Off-Highway Tires America, Inc.

September 29, 2026

**CERTIFICATE OF COMPLIANCE**

I, Eric C. Emerson, certify that the attached brief complies with the word limitation requirement, as stated in the Standard Chambers Procedures. The word count for the opening brief in support of ATC's Rule 56.2 Motion for Judgment Upon the Agency Record, as computed by the Steptoe LLP word processing system (Microsoft Word for Microsoft 365 MSO), and manual tally, is 13,897 (13,655 words in the text of the brief and 242 words within the tables on pages 32, 35, 37 and 38).

/s/ Eric C. Emerson
Eric C. Emerson, Esq.
(Lead Attorney)